Vsauce, my name is MrFudgeMonkeyz and welcome back to another video!     If you're new here, make sure to subscribe, like, comment, and share this video with your friends! Thank you, Your Honors. Good morning. I've been asked to reserve five minutes of the 10 for the co-appellee for Mr. Erickson. It's my privilege. I represent Dennis Brockway. Dennis Brockway was the developer of the South Pond apartments that are issued in the Garcia v. Brockway matter. Dennis Brockway is an individual, built these what were called fourplexes, five fourplexes of apartments. I'm sorry, you said he was the designer or the builder? He was the builder. Builder, okay, thank you. The builder and owner. And he sold, well, the completion of the last of the five units was complete in 1993. And then my client sold all of his interest, final interest, in all of the apartments in 1994. So, in 1998, he was very surprised when he received a complaint by the Idaho Fair Housing Council. Was he, for example, when a builder builds a building, presumably they're on constructive notice of all of the building code requirements and so on that have to be complied with. That's correct. It's interesting, at the time he started construction in 1991, the Fair Housing Act was just applicable. I'm just asking generally, building codes. I wasn't focused on the... Right, he received a certificate of occupancy from the city of Boise, which would have confirmed to him that the buildings were in compliance in 1998. And in compliance with the Fair Housing Act. Well, he interpreted it to be that. But is that what Boise certificate of occupancy was communicating? Well, it said that it complied with all applicable rules and regulations, which I think could reasonably be interpreted, although we're talking about a municipality as opposed to a federal agency. But trying to work our way through this, it's clear that somebody's wind up getting the short end of the stick on us. And I don't want to disguise that. I understand that on both sides. So I'm trying to figure out when Congress used the word termination, you know, to address whether the statute has some cutoff. It clearly has it. You can cut off liability by terminating, removing the offending condition. Now, what's been brought out by you and the other argument is that, look, typically builders sell off their property. They build them. They're not there to run apartments, typically. So they won't be in possession or control. That may be true. But when they design a building and there are flaws in the building, be it construction flaws or, you know, failure to implement earthquake requirements, and some event comes along later and the building collapses, or in this case a disabled person tries to rent the building, it seems a little strange to think that the builder is off the hook because somebody who didn't know about the condition wasn't around to sue, unless maybe it was, you know, an activist disabled rights group. So given that sort of paradox, what is so bad about saying to a builder that, look, when you sell your building, if you're worried about downstream liability for defects in this building, you can insure against it by entering into a buy and sell agreement. You can get indemnifications or whatever. What is so wrong with that regime? I mean, what's so drastic and draconian about it? I don't know that there's anything wrong with that, but I would propose that there would be very few buyers. Why is that? I would agree to that. And I don't know that the insurance companies would provide insurance for that. Well, it hasn't been resolved until recently that they weren't on the hook. So you're saying that people have just been buying willy-nilly without taking into account whether or not there's some exposure to the FHA? There's some due diligence that is done by the buyer, or should be done, to determine whether they are in compliance. And I think one thing that might help is to, when you think about the attempt to apply the continuing violation theory, it's not an attempt to apply a continuing condition theory. And so these cases that have looked at whether the continuing violation theory should even apply here look at whether there was some ongoing act or act or practice within this, you know, the time period two years before this. The practice here in this case, because the analogy is to the employment cases and that, or the sign and all of that, that is a practice in that sense. Here it is creating the practice of the builder in this case was to build a building where the doors didn't conform, okay? And you want to say, well, the practice was really a construction decision and it's terminated. I understand the argument. I'm just trying to understand where we draw the line here. If we don't cut it off, my client could be sued today. Yes, that's true. He could be sued 100 years from now. Well, he could, or he could take steps to remedy it. Well, let me ask you about that. I assume that these buildings change ownership more than once sometimes. How does the original builder protect himself from the fifth owner down the line? He couldn't. There would be no protection unless somehow he has a deal with the guy who buys it that that will be a part of the new setup. Sort of a covenant running with the land. Yes, and I just don't think that's going to happen. And I think the other thing I wanted to focus on, and I'm cutting into my colleague's time, is that Mr. Garcia had a remedy. He had two remedies. He pursued one. He received one against the property manager and the landowner. Notably, he also lived in the apartment for two years, but he did sue the property manager. He sued the current owners, then owners of the property, and he received a settlement from them. He also had available to him the modification fund that my client had set up for victims of housing discrimination, not necessarily at South Pond. But why did your – yeah, but that goes away. If your client didn't have any obligation, I mean, then he just did it out of the goodness of his heart. He did. And it was for any housing victim, again, not necessarily South Pond. But under your theory that he doesn't have any obligation to do that, that's just – it's fortuitous that he's a good guy and decides to pay into the fund, but he's got no liability after two years, then he doesn't really have any concern there. Well, I do think that some businessmen have. No, I do, too. So I'm not suggesting they don't, but you're saying he had – that the disabled person has a remedy. No, that's not a remedy. That's a fortuity. Maybe the reasonable accommodation or, you know, putting the burden on the current operators. I still have a little trouble understanding why the condition turns out to be an act of discrimination by the current owners. They didn't put it. They didn't create it. That's not their policy. It just happens to be a condition of the building. But you should look at then it's discriminatory to not engage in the reasonable accommodation process, which is what the claim was against the managers. And my client was not engaged in a discriminatory act. Does reasonable accommodation include widening the doorways? It may, yes. It may. So they may have to retrofit. And that sort of undercuts, does it not, the – or is somewhat in conflict with the notion of the idea that the tenant, at his own expense, is going to have to come along. Correct. There's two provisions. One is at the tenant's expense. Another one is reasonable accommodations. If you're going to leave, any time for your co-counsel. Mr. Barra. Your Honors, I am Carlton Erickson, appearing on behalf of the architect, Robert Stewart. I'll be brief here. We've discussed these issues quite extensively. But I think this is the kind of case that really illustrates the problem that we have. Most of the other cases that have been discussed really do not involve, to a major extent, the designers of these buildings. We've talked a lot about the fact that there are current managers there, the people bought from Mr. Brockway these apartment complexes. The architect, though, really has no way whatsoever to protect his interests in this, following his design of these buildings. What if he designs a faulty building? Pardon? What if he designs a faulty building? And that happened in this case, Your Honor. So how does he protect himself by complying with the applicable laws? That's the burden on him, and that's why he's a certified architect. And that's why we're here today, is because the design was not in compliance with the FHA. However, he's even a step further away from being able to ultimately resolve his liability than the builder is. He designed it. He has no power to come back in at this point or at any point and make changes to kind of cut off that potential liability that could come up, as we've discussed, 10, 15, 20, 100 years down the road. But as to him, that would have been true even within the statute of limitations, right? Pardon? That would have been true of your client even within the statute of limitations, as you would construe it, as a district court would construe it, right? That is correct, Your Honor. There was a point. I mean, he does his drawings. He never owns the property at all. They might not. He has no means of constructing it or changing the construction. He has no control over how it is actually implemented. He doesn't engage in lease or renting or anything of that sort, right? That is correct. As soon as the ink dries on the blueprints, his work is done. That is correct. And so I'm not entirely sure why he's at any worse point today than he was six months after he finished his work. Perhaps that's why we have statute of limitations, Your Honor, is at some point the courts and the legislatures have determined that you need to cut off some liability here so that a party can go on with their lives, so that they can make sure that they have... What I'm pointing out, though, is the argument he can't do anything about it is not a very good argument for you because he never could do anything about it. So you are in no worse position today than you were years ago while the statute of limitations was still active. That time has not made that any worse, right? I'd have to agree with you through that analysis. So what you really have to argue is that enough is enough. Time has passed. Let bygones be bygones. For all the other reasons that the developers have argued today, Your Honor, those same reasons apply to the architect in this case. But less. But less, yes. Okay. All right. Well, I understand. Your Honor, it looks like our time has run. Okay. Thank you. Thank you. I'll give you a minute for rebuttal if you wish to take it. You wish to take a minute for rebuttal? Do you want to take a minute? I'll give you a minute for rebuttal. You'll have to take it all. Thank you, Your Honor. Your Honor, obviously the counsel for the designers and constructors, they want to get their clients off the hook, and I understand that. I think we're all sympathetic to the position because it is a concern that liability can continue. But we have a statute, and the statute is clear that the violation — If it were all that clear, your side wouldn't have lost so many times. I'm sorry, Your Honor? If it were all that clear, your side wouldn't have lost so many times. Actually, Your Honor, our side has won the majority of the cases around the country. In fact, the old St. Andrews Court, which was — the decision was issued by the Sixth Circuit, just recently observed that the overwhelming majority of district courts have sided with our side and have applied equitable tolling or continuing violation doctrines to recognize that liability continues. In fact, only Nevada and Idaho have followed the Maseki decision, which has drawn a hard line at design and construction. Thank you, Your Honor. Thank you. Thank you.
judges: Kozinski, Fisher, Tallman